# IN THE SUPREME COURT OF IOWA

No. 15–1191

Filed June 2, 2017

Amended July 31, 2017

**SPENCER JAMES LUDMAN,**

Appellee/Cross-Appellant,

vs.

**DAVENPORT ASSUMPTION HIGH SCHOOL,**

Appellant/Cross-Appellee.

Appeal from the Iowa District Court for Scott County, Nancy S. Tabor, Judge.

A defendant appeals an adverse verdict finding it negligent in maintaining its premises. **REVERSED AND CASE REMANDED.**

Thomas M. Boes of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, for appellant/cross-appellee.

Steven J. Crowley and Edward Prill of Crowley, Bünger & Prill, Burlington, for appellee/cross-appellant.

Brian J. Humke and Ryan G. Koopmans (until withdrawal) of Nyemaster Goode, P.C., Des Moines, for amicus curiae Iowa High School Athletic Association.

Joel E. Fenton of Law Offices of Joel E. Fenton, PLLC, Des Moines, Elaine F. Gray of Fehseke & Gray Law Offices, Fort Madison, and

Eashaan Vajpeyi of Ball, Kirk & Holm, P.C., Waterloo, for amicus curiae Iowa Association for Justice.

**WIGGINS, Justice.**

A high school baseball player brought a premises liability action against a high school for his injuries after a foul ball struck him while he was standing in an unprotected part of the visitor's dugout at the high school's baseball field. The high school appeals from the judgment entered on a jury verdict finding the high school's negligence was responsible for injuries sustained by the high school baseball player. On appeal, we conclude the high school owed a duty of care to the player and substantial evidence supports the jury verdict. However, we find the district court abused its discretion in not allowing the high school to present evidence of custom. We further find the district court erred when it failed to instruct the jury on the player's failure to maintain a proper lookout. Accordingly, we reverse the judgment of the district court and remand the case to the district court for a new trial.

## I. Background Facts and Proceedings.

In May 2011, Spencer Ludman graduated from Muscatine High School. During that summer, he was a member of the school's baseball team. On July 7, Ludman traveled with his team to play a baseball game against Davenport Assumption High School at the baseball field on their school grounds.

The visiting team's dugout was located on the first-base side of the field, thirty feet from the first-base foul line. The visitor's dugout was thirty-five feet and five inches long, seven feet wide, and two steps below the playing field. There was a fence in front of the majority of the visitor's dugout, twenty-five and a half feet in length, extending from the ground to the ceiling of the dugout. At each end of the visitor's dugout, there was a five-foot-wide opening in the fence to allow players access between the field and the dugout. There was a bench in the visitor's

dugout positioned behind the fence, and it had two levels on which the players could sit.

At the top of the fifth inning, Muscatine was batting and Ludman was in the visitor's dugout with his teammates and coaches. There were two outs, and the current batter had two strikes. Ludman was due to bat after the current batter and the batter on deck. As it became unlikely he would bat that inning, Ludman grabbed his glove and hat in preparation to retake the field. After retrieving his glove and hat, he turned to watch the game and found room to stand in the south opening of the dugout, farthest from home plate.

Ludman watched the pitcher throw the ball to the batter. He heard the bat hit the ball and was looking to see where the ball went. He saw the ball in his peripheral vision before the line-drive foul ball entered the south opening of the dugout and struck him in the head. Assumption's coach saw Ludman react and try to defend himself from the ball. However, witnesses described the time from the moment the ball hit the bat until it hit Ludman as a split second.

The line-drive foul ball fractured Ludman's skull. An ambulance took him to Genesis Medical Center in Davenport, and thereafter, a helicopter transported him to the University of Iowa Hospitals and Clinics (UIHC) for treatment. Ludman's hospitalization at the UIHC lasted for twelve days before he was able to go home. After his discharge, Ludman received speech therapy, motor skills therapy, and treatment for depression and anxiety. In March of 2012, he began having seizures, requiring anti-seizure medication. He also continued to deal with posttraumatic stress symptoms, depression, and behavioral issues.

On April 5, 2013, Ludman filed a premises liability action against Assumption, alleging negligence,

a) In building, maintaining, and using a baseball facility for high school baseball games, which failed to conform to accepted standards of protection for players[;]

b) In failing to erect a protective fence/screen between home plate and the dugout where players were expected to emerge from the dugout in preparation for going to bat;

c) Knowing the visitor's dugout was extremely close to home plate, failing to take reasonable steps to prevent foul balls from entering the dugout at high speed and causing injury.

Assumption denied the claims of negligence in its answer to the petition and asserted several affirmative defenses, including the contact-sports exception to negligence, assumption of the risk, the plaintiff's negligence, and comparative fault pursuant to Iowa Code chapter 668. Thereafter, Assumption filed a motion for summary judgment alleging the contact-sports exception applied; and thus, it owed no duty to Ludman because getting hit by a foul ball is inherent in the sport of baseball and he assumed the risk of getting hit by a foul ball. Ludman resisted the motion. The court denied the motion for summary judgment.

Shortly before trial, Assumption filed a second motion for summary judgment, arguing that it was entitled to summary judgment under the inherent-risk doctrine and on the basis that there are no accepted standards for high school baseball dugouts. Ludman also resisted this motion. The district court denied Assumption's second motion for summary judgment because it was untimely and was "an attempt to rehash the same facts previously argued into a theory of law it raised in its first motion."

Before trial, the parties filed numerous motions in limine. Ludman filed a motion in limine to exclude Assumption's proffered evidence of other high school dugouts in the same conference as Assumption as proof of due care or as a standard of safety. The court sustained

Ludman's motion in limine with regard to other high school dugouts. The court decided the parties were not to refer to other dugouts during the case, but to limit themselves to precise facts before the jury concerning Assumption's facility.

On June 22, 2015, a jury trial commenced. Ludman presented several witnesses, including testimony from Scott Burton, an expert in recreational facility safety. Burton testified that, in 2000, the American Society for Testing and Materials (ASTM) promulgated standards for the fencing of baseball and softball dugouts. Section 6.6 of the standards refers to protective fencing for below-grade dugouts and recommends "the protective fencing should cover the entire opening from ground level to top of dugout roof or overhang."

Ludman also introduced evidence that the National Federation of High Schools (NFHS) and the Iowa High School Athletic Association regulate Iowa high school baseball. Under this system, the NFHS sets out rules, and the Iowa High School Athletic Association adopts and follows these rules. The 2011 NFHS Baseball Rules Book was applicable on July 7, 2011, and Ludman admitted it as a trial exhibit. With regard to dugout placement, the NFHS has a recommendation that states, "Recommended Distance from Foul Line to Nearest Obstruction or Dugout Should be 60'." The rules do not mention any other recommendations regarding positioning, fencing, or screening of dugouts.

At the close of Ludman's evidence, Assumption made a motion for directed verdict, arguing Ludman did not have sufficient evidence to satisfy the duty element of his negligence claim. Assumption further argued the claim was barred because there was no duty owed to Ludman based upon the doctrine of primary assumption of the risk as set out in

*Dudley v. William Penn College*, 219 N.W.2d 484 (Iowa 1974), and it did not breach any limited duty that was owed.

The court denied the motion. Thereafter, Assumption presented its case, including testimony from Muscatine High School's former athletic director, Tim Goodwin; Assumption's president, Andy Craig; and an architect, Greg Gowey. Assumption also made an offer of proof with regard to the custom or design of other high school dugouts in the same conference as Assumption through the testimony of Gowey. At the close of all evidence, Assumption renewed its motion for directed verdict, and the court denied it. Ludman also moved for directed verdict on comparative fault. The district court granted Ludman's motion for directed verdict as to all comparative fault except whether Ludman could have avoided the injury by standing at a different part of the dugout.

On June 30, 2015, the jury returned a verdict in favor of Ludman. The jury found thirty percent fault on the part of Ludman based upon his unreasonable failure to avoid injury. The court entered judgment in favor of Ludman.

Assumption filed this appeal, and plaintiff filed a timely notice of cross-appeal with respect to the comparative-fault issue. The day before oral argument, Assumption filed a motion to strike Ludman's final brief because it contained language not in the proof brief and deleted certain language contained in his proof brief. We entered an order submitting the motion with this appeal. Before reaching the merits of the case, we will address Assumption's motion.

## II. Motion to Strike Ludman's Final Brief.

The Iowa appellate rules provide,

> In final briefs, the parties must replace references to parts of
> the record with citations to the page or pages of the appendix

at which those parts appear. The final brief must also contain a reference to the original page and line numbers of the transcript. If references are made in the final briefs to parts of the record not reproduced in the appendix, the references must be to the pages of the parts of the record involved, e.g., Answer p. 7, Motion for Judgment p. 2, Tr. p. 231 Ll. 8-21. Intelligible abbreviations may be used. No other changes may be made in the proof briefs as initially filed, except that typographical errors may be corrected.

Iowa R. App. P. 6.904(4)(*b*). The purpose for this rule is so parties can write their briefs and reply briefs based on what is contained in the opposing party's brief. If the appellant makes changes in the final brief from the proof brief, the appellee should have the chance to change their final brief. The same is true when the appellant files a reply brief to the appellee's proof brief. This back and forth would unduly extend the time of an appeal and cause confusion. Of course, a party may amend its brief pursuant to Iowa appellate rule 6.901(6).

Comparing Ludman's proof brief with his final brief, we find the final brief contained language not in the proof brief and eliminated language from the final brief that was in the proof brief. However, due to the lateness of Assumption's motion to strike, we will not strike Ludman's brief. In the future, if we discover, either on our own or by motion of the opposing party, that a party has changed its final brief from its proof brief, we will not hesitate to strike the final brief and require that party to file another final brief in compliance with our rules.

**III. Issues.**

On appeal, Assumption argues (1) it was entitled to a directed verdict on the duty element of Ludman's negligence claim; (2) Ludman's evidence at trial was insufficient to create a jury question, regardless of the limited duty rule, and it was entitled to directed verdict in its favor; (3) the district court erred in barring it from presenting evidence

concerning the custom and standard practice in the design and construction of dugouts at schools throughout the Mississippi Athletic Conference, in which both Assumption and Muscatine High School were members; and (4) the district court erred in failing to give its requested jury instruction concerning proper lookout.

Because of our decision, we need not reach Ludman's cross-appeal.

## IV. Standard of Review.

Our review of a district court's ruling on a motion for directed verdict is for correction of errors at law. *Pavone v. Kirke*, 801 N.W.2d 477, 486–87 (Iowa 2011). "A directed verdict is required 'only if there was no substantial evidence to support the elements of the plaintiff's claim.'" *Id.* (quoting *DeBoom v. Raining Rose, Inc.*, 772 N.W.2d 1, 5 (Iowa 2009)). We "view the evidence in the light most favorable to the nonmoving party and take into consideration all reasonable inferences that could be fairly made by the jury." *Id.* (quoting *Easton v. Howard*, 751 N.W.2d 1, 5 (Iowa 2008)).

Here, Assumption claims the evidence supported a jury instruction on proper lookout. Because the failure to give the instruction does not have a discretionary function, we review the court's refusal to give a lookout instruction for correction of errors at law. *Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 707 (Iowa 2016).

Finally, our review for failure to submit custom evidence is for an abuse of discretion. *McClure v. Walgreen Co.*, 613 N.W.2d 225, 234 (Iowa 2000). A court abuses its discretion when its ruling is "clearly untenable or to an extent clearly unreasonable." *State v. Wilson*, 878 N.W.2d 203, 210–11 (Iowa 2016). An erroneous application of the law by the district court is clearly untenable. *Id.*

**V. Whether Assumption Was Entitled to a Directed Verdict on the Duty Element of Ludman's Negligence Claim.**

Although intermingled throughout its argument, Assumption appears to make two arguments as to why it did not owe a duty to Ludman, entitling it to a directed verdict. Assumption's first contention is that the contact-sports exception to liability discussed in *Feld v. Borkowski*, 790 N.W.2d 72, 77 (Iowa 2010), precludes a finding it owed a duty to Ludman. Assumption next contends the doctrine of primary assumption of the risk precludes a finding it owed a duty to Ludman because the risk of injury was open and obvious to him. In its argument, Assumption relies on our decisions in *Arnold v. City of Cedar Rapids*, 443 N.W.2d 332 (Iowa 1989), and *Dudley*, 219 N.W.2d 484.

**A. General Tort Principles Governing Assumption's Duty to Ludman.** Ludman pled and tried his action as a premises liability claim. In 2009, we changed the law concerning premises liability by abandoning the common law distinctions between invitees and licensees. *Koenig v. Koenig*, 766 N.W.2d 635, 645 (Iowa 2009). We found the common law rules governing premises liability before *Koenig* to be replete with special rules and arbitrary distinctions. *Id.* at 644. In *Koenig*, we adopted a general negligence standard for possessors of land to invitees and licensees. *Id.* at 645–46. We adopted the following multifactor approach:

> We impose upon owners and occupiers only the duty to exercise reasonable care in the maintenance of their premises for the protection of lawful visitors. Among the factors to be considered in evaluating whether a landowner or occupier has exercised reasonable care for the protection of lawful visitors will be: (1) the foreseeability or possibility of harm; (2) the purpose for which the entrant entered the premises; (3) the time, manner, and circumstances under which the entrant entered the premises; (4) the use to which the premises are put or are expected to be put; (5) the reasonableness of the inspection, repair, or warning; (6) the opportunity and ease of repair or correction or giving of the

warning; and (7) the burden on the land occupier and/or community in terms of inconvenience or cost in providing adequate protection.

*Id.* (quoting *Sheets v. Ritt, Ritt & Ritt, Inc.*, 581 N.W.2d 602, 606 (Iowa 1998)).

Since our decision in *Koenig,* we have not had the opportunity to explore the contours of a premises liability claim. However, after *Koenig,* the Restatement of Torts (Third) adopted the position we took on premises liability. Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 51, at 242 (Am. Law Inst. 2012). The Restatement (Third) of Torts: Liability for Physical and Emotional Harm formulates a landowner's duty as follows:

Subject to § 52, a land possessor owes a duty of reasonable care to entrants on the land with regard to:

(a) conduct by the land possessor that creates risks to entrants on the land;

(b) artificial conditions on the land that pose risks to entrants on the land;

(c) natural conditions on the land that pose risks to entrants on the land; and

(d) other risks to entrants on the land when any of the affirmative duties provided in Chapter 7 is applicable.

*Id.*

Comment *i* to section 51 sets forth the duty of reasonable care incorporating the same factors we adopted in *Koenig. Id.* § 51 cmt. *i*, at 248–50. Accordingly, we adopt the duty analysis for land possessors contained in section 51 of the Restatement (Third) of Torts: Liability for Physical and Emotional Harm. We now must determine if the contact-sports exception to liability or primary assumption of the risk or limited-

duty rule due to an open and obvious condition relieves Assumption of the duty contained in section 51 of the Restatement (Third).

**B. Contact-Sports Exception.** Section 51 has not modified the principles of a no-duty rule contained in the remainder of the Restatement (Third) of Torts: Liability for Physical and Emotional Harm. *Id.* § 51 cmt. *b*, at 243–44. Thus,

> [i]n exceptional cases, when an articulated countervailing principle or policy warrants denying or limiting liability in a particular class of cases, [we] may decide that the defendant has no duty or that the ordinary duty of reasonable care requires modification.

*Id.* § 7(b), at 77 (Am. Law Inst. 2010). In other words, we have found "some activities or circumstances have been excepted from the reasonable-care duty in favor of the imposition of a less stringent duty of care." *Feld*, 790 N.W.2d at 76. "One such activity that has been identified as an exception is contact sports." *Id.* We formulated the contact-sports exception as follows:

> [K]nown risks associated with a contact sport are assumed by participants in the sport, and it is inapposite to the competitiveness of contact sports to impose a duty on *participants to protect coparticipants* from such known and accepted risks through the exercise of reasonable care.

*Id.* at 76–77 (emphasis added). By definition, the contact-sports exception applies only to a duty owed by one participant in the sport to another.

We have only recognized the contact-sports exception in cases relating to the duty of care owed by the participants in an activity and, like other jurisdictions, have not applied it to the duty of owners of a sports facility in a premises liability action. *See id.* at 79 (holding softball is a contact sport and any liability of the batter had to be predicated on

reckless conduct rather than ordinary negligence); *Leonard ex rel. Meyer v. Behrens*, 601 N.W.2d 76, 81 (Iowa 1999) (per curiam) (holding the game of paintball to be a contact sport and imposing a duty for participants in the sport to refrain from reckless or intentional conduct). Courts generally accept the view that the contact-sports exception only applies to participants. *See generally* Richard E. Kaye, Annotation, *Construction and Application of Contact Sports Exception to Negligence,* 75 A.L.R.6th 109, 121–22 (2012).

Ludman bases his action on premises liability. Ludman's action is against the possessor of the premises, not a fellow participant. Thus, the contact-sports exception is not applicable.

**C. Primary Assumption of the Risk or Limited-Duty Rule Because the Risk of Injury Was Open and Obvious to Ludman.** In its brief, Assumption fails to recognize *Koenig* as the controlling law in a premises liability action. Rather, it relies on section 343A of the Restatement (Second) of Torts to support its position. The Restatement (Second) made distinctions regarding the duty owed by a possessor of land as to whether the person on the land was an invitee or licensee. *See* Restatement (Second) of Torts §§ 342–43, at 210–18 (Am. Law Inst. 1965) [hereinafter Restatement (Second)]. It also had a no-duty rule on known or obvious risks. The Restatement (Second) provided,

> A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.

*Id.* § 343A(1), at 218. The cases Assumption relies on also predate *Koenig.*

In *Dudley*, a college baseball player sued his coach and college after a foul ball struck him in the eye while sitting on the bench during a home baseball game. *Dudley*, 219 N.W.2d at 484–85. The college baseball diamond did not have dugouts or netting protecting the bench from the playing field. *Id.* at 485. Dudley's principal claim was that his college and his coach should have protected him and other players "by a fence, a screened dugout, a greater distance, or some other method." *Id.* at 486. We acknowledged that Dudley was not a spectator, but a member of the team. *Id.*

While we said, "players in athletic events accept the hazards which normally attend the sport," we clearly stated that "the sponsor is [not] absolved of using care." *Id.* The owner of a ballpark or sponsor of the sporting event was still "subject to the general duty to conduct himself as an ordinarily prudent person under like circumstances to protect others from unreasonable risk of harm." *Id.* (citing Restatement (Second) §§ 282, 283 and William L. Prosser, *Handbook on the Law of Torts* §§ 31–32, at 145, 149 (4th ed. 1971)). We further stated that when a player introduces "substantial proof of want of due care by the sponsor, the player generates a jury issue on negligence." *Id.*

The use of the term substantial proof did not connote a higher standard to prove negligence. Rather, our courts use the phrase substantial proof interchangeably with the term substantial evidence. *Offermann v. Dickinson*, 175 N.W.2d 423, 425–26 (Iowa 1970). "Evidence is substantial if a jury could reasonably infer a fact from the evidence." *Johnson v. Interstate Power Co.*, 481 N.W.2d 310, 317–18 (Iowa 1992).

We found, however, that Dudley did not present substantial evidence to generate a question for the jury on his negligence claim. *Dudley*, 219 N.W.2d at 486. We did not find the college or coach owed no

duty as a matter of law to Dudley because he was a baseball player or he had assumed the inherent risks of participating in a baseball game. We merely found Dudley failed to prove evidence sufficient to support his claim of negligence. *Id.* at 486–87.

The next case Assumption relies upon involves a spectator hit by a misthrown ball at a softball facility. *Arnold*, 443 N.W.2d at 332. There, we noted the doctrine of primary assumption of the risk is a limited-duty rule. *Id.* at 333. We explained the doctrine as follows:

> Primary assumption of the risk is not an affirmative defense. It is "an alternative expression for the proposition that defendant was not negligent, *i.e.*, either owed no duty or did not breach the duty owed." It is based on the concept that a plaintiff may not complain of risks that inhere in a situation despite proper discharge of duty by the defendant. Primary assumption of risk is merely a label for denying that a duty existed or that a duty was breached.

*Id.* (quoting *Nichols v. Westfield Indus., Ltd.*, 380 N.W.2d 392, 399 (Iowa 1985)).

There, we drew a line on the scope of a duty of care an owner or operator of a ballpark owes to "protect spectators of a baseball game at a baseball park" in the area behind home plate. *Sweeney v. City of Bettendorf*, 762 N.W.2d 873, 887 (Iowa 2009) (Cady, J., dissenting). We held, the owner of the park "need only provide screening for the area of the field behind home plate where the danger of being struck by a ball is the greatest." *Arnold*, 443 N.W.2d at 333. If a spectator chooses to sit in a less protected area, the spectator may not complain of risks that are open and obvious in not sitting behind a screen; and thus, the owner of the park has no duty to that spectator. *Id.* at 333–34.

Subsequent to our decision in *Arnold*, two developments in the law occurred. First, our court has been hesitant to continue to apply this

limited-duty rule. Second, the Restatements of Torts (Third) have backed away from a no-duty rule when the plaintiff knows of an open and obvious risk inherent in an activity.

1. *Iowa caselaw.* In 1995, we refused to apply a limited-duty rule to the risk inhering when a person walks on an icy parking lot. *Wieseler v. Sisters of Mercy Health Corp.*, 540 N.W.2d 445, 452 (Iowa 1995). In *Wieseler*, we acknowledged the dangers of walking on ice were known or obvious to the plaintiff. *Id.* at 451. However, the known and obvious danger was not determinative of the landowner's duty. Rather, a danger that is known and obvious goes to the question of whether the plaintiff was negligent. *Id.*

In a recent case, we refused to extend the limited-duty rule to a negligent supervision situation at a baseball park. *Sweeney*, 762 N.W.2d at 882 (majority opinion). In *Sweeney*, we noted that despite our recognition of the limited-duty rule,

> [t]here has been some resistance to inherent risk or the limited duty doctrine. For example, Professor James noted long ago that the primary assumption of risk doctrine, of which the limited duty rule is a variant, provides "an exceptional curtailment of defendant's duty below the generally prevailing one to take care to conduct oneself so as not to cause unreasonable danger to others." . . . There appears to be a move within the legal profession away from the rule.

*Id.* at 882 n.4 (quoting James Fleming Jr., *Assumption of Risk*, 61 Yale L.J. 141, 168 (1952)).

2. *Position of Restatements (Third) of Torts.* The Restatement (Third) of Torts: Liability for Physical and Emotional Harm and the Restatement (Third) of Torts: Apportionment of Liability indicate there is a move to abandon a no-duty rule when plaintiff knows of an open and obvious risk inherent in an activity.

Our decision in *Koenig* aligns our law with section 51 of the Restatement (Third) of Torts: Liability for Physical and Emotional Harm's position. Comment *k* to section 51 provides, in relevant part,

> Known or obvious dangers pose less of a risk than comparable latent dangers because those exposed can take precautions to protect themselves. Nevertheless, despite the opportunity of entrants to avoid an open and obvious risk, in some circumstances a residual risk will remain. Land possessors have a duty of reasonable care with regard to those residual risks. Thus, the fact that a dangerous condition is open and obvious bears on the assessment of whether reasonable care was employed, but it does not pretermit the land possessor's liability. This treatment of land possessors is consistent with that of other actors who create risks.
>
> An entrant who encounters an obviously dangerous condition and who fails to exercise reasonable self-protective care is contributorily negligent. Because of comparative fault, however, the issue of the defendant's duty and breach must be kept distinct from the question of the plaintiff's negligence. The rule that land possessors owe no duty with regard to open and obvious dangers sits more comfortably— if not entirely congruently—with the older rule of contributory negligence as a bar to recovery.

Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 51 cmt. *k*, at 251–52 (citation omitted).

Section 51 is consistent with our decision in *Wieseler*. There, we recognized the plaintiff's knowledge of a known open and obvious risk inherent in walking on an icy surface did not end the duty analysis. *Wieseler*, 540 N.W.2d at 450. Even though the risk was open and obvious, a possessor of land could be liable if the possessor realizes the plaintiff might fail to protect him or herself from the condition or realize how dangerous the condition was in spite of its openness and obviousness. *Id.* at 452.

The court gave Assumption an instruction on these very points. Instruction No. 12 provided in part that Ludman had to prove as an element of his case:

> 1. That Assumption knew, or in exercise of reasonable care should have known that the location and condition of the visitor's dugout at the Assumption ball field involved an unreasonable risk of injury to a person such as Spencer Ludman as a visiting ball player.
>
> 2. Assumption knew or in the exercise of reasonable care, should have known:
>
>> a) That the plaintiff would not discover the condition, or
>>
>> b) The plaintiff would not realize the condition presented an unreasonable risk of injury, or
>>
>> c) The plaintiff would not protect himself from the condition.[1]

Additionally, *Wieseler* acknowledges plaintiff's knowledge of an open and obvious risk inherent in an activity is not conclusive in determining the possessor of land's duty. *Id.* at 451–52. Rather, it is

---

[1]Under the Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 51, this part of the instruction may no longer be needed. As comment *a* of the Restatement (Third) points out,

> The rule requires a land possessor to use reasonable care to investigate and discover dangerous conditions and to use reasonable care to attend to known or reasonably knowable conditions on the property. While § 343 also required that the danger be one that the land possessor expects entrants will not discover or, even if known, will fail to protect themselves against, here that requirement is subsumed within the reasonable-care standard, which only requires attending to the foreseeable risks in light of the then-extant environment, including foreseeable precautions by others.

Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 51 cmt. *a,* at 243.

important in determining whether the court will allow the jury to find plaintiff has some degree of contributory fault. *Id.* at 451.

The Restatement (Third) of Torts: Apportionment of Liability supports *Wieseler*'s conclusion that the plaintiff's knowledge of an open and obvious risk inherent in an activity applies to the plaintiff's contributory fault, but does not negate the possessor of land's duty. Comment *c* to section 3 of the Restatement (Third) of Torts: Apportionment of Liability provides in relevant part,

> A plaintiff who is actually aware of a *reasonable* risk and voluntarily undertakes it, as when a parent tries to rescue a child from a fire, is not negligent. The parent may, however, be negligent for other reasons, such as the manner of the rescue. When a plaintiff is negligent, the plaintiff's awareness of a risk is relevant to the plaintiff's degree of responsibility.

Restatement (Third) of Torts: Apportionment of Liab. § 3 cmt. *c*, at 32 (Am. Law Inst. 2000). An illustration appearing in the Restatement (Third): Apportionment of Liability provides,

> A attends a baseball game at B's ballpark. A sits in a portion of the stands beyond the point where the screen prevents balls from entering the seats. A is aware that balls occasionally are hit into the stands. The fact that A knew balls are occasionally hit into the stands does not constitute assumption of risk. The fact that A knew balls occasionally are hit into the stands is relevant in evaluating whether A acted reasonably by engaging in particular types of conduct while sitting in the stands (sitting in the stands would not itself constitute unreasonable conduct). If the factfinder concludes that A did not act reasonably under the circumstances, A's knowledge of the risk is relevant to the percentage of responsibility the factfinder assigns to A. See § 8. If B could reasonably assume that A and other fans are aware that balls are occasionally hit into the stands, this fact is also relevant to whether B acted reasonably in relying on A to watch out for balls instead of constructing a screen or providing warnings.

*Id.* § 3 cmt. *a,* illus. 6, at 32–33.

The commenters to the Restatement explain the reason for its position as follows:

> A plaintiff who acts unreasonably in the face of a known danger may be more culpable than is a plaintiff who acts unreasonably in the face of an unknown risk. Moreover, a defendant's reasonable belief about the plaintiff's state of mind might be relevant to determining whether the defendant was negligent. A defendant could argue that he relied on the plaintiff to watch out for her own safety, such as when a person playing catch relies on a belief that the other person knows the ball is coming. A person who reasonably believes another person knows about a risk might reasonably undertake fewer burdens in protecting the other person. Some courts call that doctrine *"primary assumption of risk."* This Section does not affect the way a plaintiff's knowledge of a risk might bear on an evaluation of whether the defendant was negligent.

*Id.* § 3 Reporters' Note cmt. *c*, at 42 (citations omitted) (emphasis added).

We need not decide today whether *Arnold* is still good law in light of the Restatement (Third) of Torts: Apportionment of Liability's position. The case before us centers on an allegation that the dugout was defectively designed and therefore dangerous. It does not involve a spectator sitting in an unprotected area of the stadium.

The instructions given by the court in this case were consistent with the progression of our law after we decided *Arnold.* They are also consistent with the Restatement (Third) of Torts: Liability for Physical and Emotional Harm and the Restatement (Third) of Torts: Apportionment of Liability.

**D. Conclusion.** Accordingly, we find the district court was correct in overruling Assumption's motions for directed verdict based on the

contact-sports exception and primary assumption of the risk or limited-duty rule.[2]

**VI. Whether Ludman Presented Sufficient Evidence to Give Rise to a Jury Question.**

Assumption argues that even if we find it owed a duty of care to Ludman, the court should have still granted judgment in its favor based upon insufficiency of the evidence to generate a jury question under the general negligence standard applicable in this premises liability case.

The parties disagree as to which instruction on negligence we should measure the sufficiency of the evidence. Ludman contends that he produced sufficient evidence at trial to meet all of the elements of Jury Instruction No. 11, which the court based on the general negligence instruction we adopted in *Koenig.*

Jury Instruction No. 11 provided,

> Owners and occupiers of land, including the ball park which is at issue in this case, owe a duty to exercise reasonable care in the mainten[ance] of their premises for the protection of lawful visitors. You may consider the following factors when evaluating whether Assumption exercised reasonable care for the protection of lawful visitors such as Spencer Ludman:
>
> 1. The foreseeability or possibility of harm;
>
> 2. The purpose for which the visitor entered the premises;

---

[2]Even if the primary assumption of the risk or limited-duty rule were still viable, we doubt they would apply to the facts of this case. The facts of this case are similar to the cases in which courts allow spectators to recover for negligence when an owner fails to provide or maintain sufficient screening behind home plate. *See Edling v. Kansas City Baseball & Exhibition Co.*, 168 S.W. 908, 910 (Mo. Ct. App. 1914); *Uzdavines v. Metro. Baseball Club, Inc.*, 454 N.Y.S.2d 238, 245–46 (Civ. Ct. 1982). The danger of a player being hit by a foul ball in the dugout is not an inherent risk if the dugout was properly designed.

3. The time, manner, and circumstances under which the visitor entered the premises;

4. The use to which the premises are put or are expected to be put;

5. The reasonableness of the inspection, repair;

6. The opportunity and ease of repair or correction; and

7. The burden on the land occupier and/or community in terms of inconvenience or costs in providing adequate protection.

8. Any other factors shown by the evidence bearing on this question.

Assumption claims that Ludman failed to prove the elements in Jury Instruction No. 12. Jury Instruction No. 12 is based on the Iowa Bar Association's Iowa Civil Jury Instruction 900.1 (premises liability—essentials for recovery—condition of premises—duty to lawful visitors). Ludman did not challenge Instruction No. 12 and submitted it as a proposed instruction. Because neither party objected to this instruction, it becomes the law of the case. *Easton*, 751 N.W.2d at 5.

Jury Instruction No. 12 provided,

In order to recover damages in this case, Spencer Ludman must prove all of the following propositions by preponderance of the evidence:

1. That Assumption knew, or in exercise of reasonable care should have known that the location and condition of the visitor's dugout at the Assumption ball field involved an unreasonable risk of injury to a person such as Spencer Ludman as a visiting ball player.

2. Assumption knew or in the exercise of reasonable care, should have known:

a) That the plaintiff would not discover the condition, or

b) The plaintiff would not realize the condition presented an unreasonable risk of injury, or

c) The plaintiff would not protect himself from the condition.

3. Assumption was negligent because, given the proximity and location of the visitor's dugout to home plate, it failed to take reasonable care to protect people such as Spencer Ludman in:

a) failing to fence or protect the entire area of the dugout with gates or barriers, or

b) failing to provide an alternate entrance

4. That Assumption's negligence was a cause of the plaintiff's damage.

5. The nature and extent of the damage.

6. If the plaintiff has failed to prove any of these propositions, the plaintiff is not entitled to damages. If the plaintiff has proved all of these propositions, then you will consider the defense of unreasonable failure to avoid an injury, as explain in instruction number 13. [3]

We construe jury verdicts liberally to give effect to the intention of the jury. *Olson v. Prosoco, Inc.*, 522 N.W.2d 284, 292 (Iowa 1994). A court should only grant a directed verdict if there is no substantial evidence to support the elements of the plaintiff's claim. *Pavone v. Kirke*, 801 N.W.2d 477, 486 (Iowa 2011). Evidence is substantial "[w]hen reasonable minds would accept the evidence as adequate to reach the same findings." *Easton*, 751 N.W.2d at 5. A directed verdict is improper and the case must go to the jury where reasonable minds could differ on an issue. *Pavone*, 801 N.W.2d at 487. In determining if there was substantial evidence to submit the issue to the jury, we must "take into

---

[3]As stated in footnote 1, paragraphs 2a, 2b, and 2c of this instruction may no longer be needed.

consideration all reasonable inferences that could be fairly made by the jury" and "view the evidence in the light most favorable to the nonmoving party." *Id.*

Ludman presented evidence of the ASTM standards, which recommended a protective fencing cover the entire opening of a subgrade dugout. He also presented evidence of the NFHS recommendation that a dugout should be sixty feet from the foul line. Ludman introduced evidence that Assumption did not comply with either of these standards.

Ludman did not realize the visitor's dugout strayed from these recommendations as he testified the only thing he noticed about the dugout was that it was cramped and had a cement floor. He testified that he did not realize Assumption had replaced the net that used to cover the top portion of the dugout with a fence. In short, substantial evidence supports the propositions that Ludman would not discover the condition, or not realize the condition presented an unreasonable risk of injury, or would not protect himself from the condition.

Assumption's coach testified that he had seen foul balls enter the visitor's dugout prior to Ludman's injury. Ludman introduced purported safer alternative designs, such as fencing the entire dugout and moving a protective doorway to the south end, the installation of L-shaped barriers for each door, or moving the visitor's dugout.

Thus, viewing the evidence in the light most favorable to Ludman and taking into consideration all reasonable inferences that a jury could fairly make, Ludman presented sufficient evidence to give rise to his negligence claim against Assumption.

**VII. Whether the District Court Erred in Barring Assumption from Presenting Evidence Concerning the Custom and Standard Practice in the Design and Construction of Dugouts at Schools Throughout the Mississippi Athletic Conference.**

**A. Law Generally.** "[E]vidence of what is usual and customary is generally admissible on the issue of negligence." *McCrady v. Sino*, 254 Iowa 856, 861, 118 N.W.2d 592, 594–95 (1962). "An actor's compliance with the custom of the community, or of others in like circumstances, is evidence that the actor's conduct is not negligent but does not preclude a finding of negligence." Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 13, at 146. "A custom is a widespread and, for some courts, nearly universal practice." Kenneth S. Abraham, *Custom, Noncustomary Practice, and Negligence*, 109 Colum. L. Rev. 1784, 1788 (2009) (citing Dan B. Dobbs, *The Law of Torts* § 163, at 394 (2000)). In a footnote, Abraham further states,

> Although the courts rarely engage in an express headcount, discussions of the custom rule seem to me to presuppose that a practice must be followed by at least a majority of relevant actors in order to qualify as a custom.

*Id.* at 1788 n.9.

A witness who is qualified by knowledge and experience can testify to a custom or usage's existence in a particular trade or business. *McCrady*, 254 Iowa at 861, 118 N.W.2d at 595. The testimony does not have to call for the opinion of the witness as an expert. *Gibson v. Shelby Cty. Fair Ass'n*, 246 Iowa 147, 153, 65 N.W.2d 433, 437 (1954). Instead, the record must establish the custom as a matter of fact, not as a matter of opinion. *Id.* A witness may testify to the existence, as a fact, of a custom or usage, if he or she is qualified by knowledge and experience in any particular trade. *Id.* To be qualified to testify as to custom and usage, the person testifying must have "adequate knowledge of the

custom or usage as a fact" and "occup[y] such a position as to know of the existence of the custom as a fact." *Id.* (quoting 32 C.J.S. *Evidence* § 483). In other words, if a person knows what a custom is, that person is qualified to testify to the custom.

However, we have developed some limitations on the admissibility of custom and usage testimony. One such exception is that a court should not admit a custom into evidence if the custom does not extend to the type of conduct at issue in the litigation. *Simon's Feed Store, Inc. v. Leslein*, 478 N.W.2d 598, 602 (Iowa 1991). In *Simon's Feed Store, Inc.*, we concluded that a jury instruction on custom was reversible error because

> there was no showing made that the design criteria applicable to bridges on public highways constitute a custom that is generally followed in designing bridges on privately owned roadways. In the absence of proof of similar anticipated traffic patterns, the seemingly great difference in amounts and types of traffic negates any suggestion of comparability.

*Id.*

Another limitation is that we do not allow admission of custom or usage if the act itself is clearly careless or dangerous. *Iverson v. Vint*, 243 Iowa 949, 951–52, 54 N.W.2d 494, 495–96 (1952). In *Iverson*, we refused to admit evidence regarding the dumping of spoiled molasses. *Id.* In reaching this conclusion, we stated,

> The evidence relied upon in the case at bar does not show a custom to exercise care in the disposal of large quantities of spoiled molasses. On the contrary, it shows the absence of any precautions. "It is common practice . . . to dump it wherever they can. We dumped it where it was most convenient." The failure to exercise any precautions in the disposal of this mass of molasses would indicate negligence rather than reasonable care.

*Id.* at 952, 54 N.W.2d at 495–96.

**B. Analysis.** Assumption attempted to introduce pictures of dugouts from nine other schools in the same high school conference as evidence of custom in the design of dugouts. The district court did not allow this testimony stating,

> Plaintiff is seeking to provide evidence of the alleged due care standard by expert testimony, not by custom. Therefore, what other schools do as to following the regulations or agreeing to play on a non-regulated field is irrelevant to what Defendant did in this case or whether Defendant has no duty. To allow that comparison would be similar to allowing a motorist to argue that because they were in a line of cars that were all exceeding the speed limit that they did not violate the speeding law in effect for that portion of the roadway.

We find the district court's comparison to speed limit laws are like comparing apples to oranges. Generally, if there is a conflict between a statute and custom, the statute controls. *Langner v. Caviness*, 238 Iowa 774, 778, 28 N.W.2d 421, 423 (1947). Motorists are required to follow speed limit laws unless the motorist has a legal excuse. *Deweese v. Iowa Transit Lines*, 218 Iowa 1327, 1332, 256 N.W. 428, 430 (1934). In this case, there are no mandatory statutes requiring Assumption to build its field in any specific manner. Second, parties can prove negligence by expert testimony or by custom. We cannot find any authority precluding a party from using a different method than that of the opposing party to prove or disprove negligence. *See Parsons v. Nat'l Dairy Cattle Cong.*, 277 N.W.2d 620, 624 (Iowa 1979) (alluding to the fact that the jury weighs custom against expert testimony to determine negligence).

Assumption attempted to establish custom through the testimony of architect Greg Gowey. In its offer of proof and his testimony, Assumption established Gowey had designed baseball facilities and was familiar with nine dugouts from other schools in the conference. He

testified concerning the design of those dugouts. One dugout at Bettendorf had openings at the sides of the visitor's dugout. All the other schools had openings in the front of the visitor's dugouts, although Pleasant Valley had only one opening in the front of the dugout nearest to home plate. The rest of the schools had two openings similar to Assumption's dugout for visitors.

Gowey, by his knowledge and experience, knew what the custom as to the design of the visitor's dugout was throughout the conference. This made him qualified to testify. Although one school only had one opening in the front of its visitor's dugout and another school had side entrances, we find the testimony was sufficient for the jury to consider if Assumption was not negligent due to the custom of the community.

Evidence of custom is not conclusive on Assumption's lack of negligence. *See Bradshaw v. Iowa Methodist Hosp.*, 251 Iowa 375, 385, 101 N.W.2d 167, 173 (1960). It is still up to the jury to weigh the evidence of custom against the other evidence in the record and ultimately determine the issue of negligence based on the facts and circumstances of the case. *Parsons*, 277 N.W.2d at 624.

Accordingly, we find the district court abused its discretion by not allowing the evidence of custom.

**VIII. Whether the District Court Erred by Precluding a Jury Instruction on Proper Lookout.**

Assumption argues the court should have permitted a jury instruction on proper lookout "as there was competent evidence at trial that Ludman voluntarily placed himself in an unprotected area of the dugout and then failed to watch as the batter swung and struck the ball that subsequently hit him." We measure whether a person maintains a proper lookout by what an ordinarily reasonable and prudent person

would do under the same or similar circumstances. *Coker v. Abell-Howe Co.*, 491 N.W.2d 143, 150 (Iowa 1992). A " '[p]roper lookout' means more than merely to look straight ahead, or more than seeing the object." *Id.* A proper lookout "implies being watchful of the movements of one's self in relation to the things seen and which could have been seen in the exercise of ordinary care." *Id.* Assumption requested the court to instruct the jury on lookout as part of its comparative-fault defense. The instruction it asked the court to submit was a proper statement of the law.

"As long as a requested instruction correctly states the law, has application to the case, and is not stated elsewhere in the instructions, the court must give the requested instruction." *Beyer v. Todd*, 601 N.W.2d 35, 38 (Iowa 1999) (quoting *Vaughan v. Must, Inc.*, 542 N.W.2d 533, 539 (Iowa 1996)). If substantial evidence in the record supports a party's legal theory, it is entitled to submit that theory to the jury. *Id.* "Evidence is substantial enough to support a requested instruction when a reasonable mind would accept it as adequate to reach a conclusion." *Id.* (quoting *Bride v. Heckart*, 556 N.W.2d 449, 452 (Iowa 1996)). However, we will not reverse the district court's failure to give a requested jury instruction unless it prejudices the party requesting the instruction. *Id.*

Ludman resisted Assumption's request for the instruction on proper lookout, contending that the only testimony in the record was that he was looking out of the dugout at the field of play. In response to Assumption's request for a proper lookout instruction, the court denied its submission to the jury, stating,

> As to the proper lookout, I do believe that there's evidence -- the direct evidence of everyone was that he was

facing the field. He was watching the game. He was encouraging or whatever. There's issues of whether he was -- the only thing that I can point to in the evidence would be the newspaper article talking about him taking off the batting helmet, which seemed to infer that he had turned, and I don't believe anybody -- there was no testimony before us here of any eyewitness that said that he actually turned his back. That was the whole batting helmet thing.

I do find that the motion should be granted as to the proper lookout, but I'm going to submit comparative fault as to whether he could have avoided the injury by standing at a different part of the dugout.

On appeal, we have the benefit of Ludman's testimony from the transcript. At trial, he testified as follows:

Q: What was your -- so you saw the pitch thrown? A: Yes.

Q: And did you see Brooks hit it or what happened next? A: I heard him hit it. Um, I saw the pitch being thrown, and the way I was positioned coming back toward facing the field, so putting my foot on the step and everything, I saw the pitch being thrown, and the next thing I saw was the ball.

Q: Where was the ball in your field of vision at that point? A: Right here.

Q: You're indicating with your left hand up by the left side of your head? A: Yes.

Q: So when you finally picked it up off of -- strike that. When you visually picked the ball up, was it that close to you? A: Yes. It was peripheral vision, is how I could see it.

Although Ludman stated he was watching the game, a reasonable person could find he failed to follow the ball from the pitcher to the batter's bat and therefore, failed to maintain a proper lookout. Under the law of proper lookout, a jury could have decided Ludman was not "being watchful of the movements of one's self in relation to the things seen" by failing to follow the ball, and that constituted negligence. *See Coker*, 491

N.W.2d at 150. We also cannot say the court's failure to give this instruction did not prejudice Assumption. Accordingly, based on Ludman's testimony regarding his lookout, it was error for the court not to instruct the jury on proper lookout.

### IX. Disposition.

We find that Assumption owed a duty of care to Ludman and substantial evidence supported the jury verdict. However, we find the district court abused its discretion in not allowing Assumption to present evidence of custom. We further find the district court erred when it failed to instruct the jury on the failure to maintain a proper lookout. Accordingly, we reverse the judgment of the district court and remand the case to the district court for a new trial.

**REVERSED AND CASE REMANDED.**